Approved: _____

       JAIMIE L. NAWADAY
       Assistant U.S. Attorney

Before:  THE HONORABLE KEVIN NATHANIEL FOX
       United States Magistrate Judge
       Southern District of New York

**U.S. DISTRICT COURT FILED OCT 28 2016 S.D. OF N.Y.**

**ORIGINAL**

**DOC # _____**

**16 MAG    6976**

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA     :    **SEALED COMPLAINT**

   - v. -          :    Violations of
                     18 U.S.C. § 1956
CARLOS DJEMAL, ISIDORO HAIAT,  :    18 U.S.C. § 1349
BRAULIO LOPEZ, ROBERTO MORENO,    18 U.S.C. § 1343
MAX FRAENKEL, and         :
DANIEL BLITZER,             COUNTY OF OFFENSE:
                   :    NEW YORK
Defendants.

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      PETER CHARTIER, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations, and charges as follows:

COUNT ONE
(Money Laundering Conspiracy)

    1.    From at least in or about June 2011 through at least in or about May 2016, in the Southern District of New York and elsewhere, CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

    2.    It was a part and an object of the conspiracy that BRAULIO LOPEZ, ROBERTO MORENO, CARLOS DJEMAL, ISIDORO HAIAT, MAX FRAENKEL, and DANIEL BLITZER, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument or funds from a place in the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful

activity, that is, wire fraud, in violation of Title 18, United
States Code, Section 1343.

(Title 18, United States Code, Sections 1956(h).)

## COUNT TWO
(International Money Laundering)

3.    From at least in or about June 2011, through at least
in or about May 2016, in the Southern District of New York and
elsewhere, CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO
MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants,
transported, transmitted, and transferred, and attempted to
transport, transmit, and transfer, a monetary instrument or
funds from a place in the United States to or through a place
outside the United States and to a place in the United States
from or through a place outside the United States, with the
intent to promote the carrying on of specified unlawful
activity, to wit, DJEMAL, HAIAT, LOPEZ, MORENO, FRAENKEL,
BLITZER, transferred funds from bank accounts in Mexico held by
various shell companies, to bank accounts in the United States
held by various shell companies, and back to other shell company
accounts in Mexico, falsely characterizing the transfers as
payments for cellular telephones that were never in fact
purchased or sold, with the intent to promote a wire fraud
scheme to defraud the Mexican government by obtaining fraudulent
tax refunds.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

## COUNT THREE
(Wire Fraud Conspiracy)

4.    From at least in or about June 2011 through at least
in or about May 2016, in the Southern District of New York and
elsewhere, CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO
MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, and
others known and unknown, willfully and knowingly, did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

5.    It was a part and object of the conspiracy that CARLOS
DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO MORENO, MAX
FRAENKEL, and DANIEL BLITZER, the defendants, and others known

and unknown, willfully and knowingly, having devised a scheme
and artifice to defraud and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by
means of wire, radio, and television communication in interstate
and foreign commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, in
violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR
(Wire Fraud)

6.    From at least in or about June 2011 through at least
in or about May 2016, in the Southern District of New York and
elsewhere, CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO
MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, having
devised a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, or promises, did transmit and caused to be
transmitted by means of wire, radio, and television
communication in interstate commerce, writings, signs, signals,
pictures, or sounds for the purpose of executing such scheme and
artifice, to wit, DJEMAL, HAIAT, LOPEZ, MORENO, FRAENKEL, and
BLITZER, transferred funds by means of wire from various shell
company bank accounts in Mexico, to various shell company bank
accounts in the United States, and back to other shell company
accounts in Mexico, falsely characterizing the transfers as
payments for cellular telephones that were never in fact
purchased or sold as part of a scheme to defraud the Mexican
government by obtaining fraudulent tax refunds.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

7.    I have been a Special Agent with the United States
Department of Homeland Security, Immigration and Customs
Enforcement, Homeland Security Investigations ("HSI"), assigned
to HSI's office in Newark, New Jersey. I am currently assigned
to a financial crimes group and have been employed as an HSI
Special Agent since November 2011. Prior to my employment with
HSI, I was a Special Agent with the Internal Revenue Service for

approximately seven years.  I have participated in and conducted
many criminal investigations involving violations of federal
money laundering and customs laws.  In the course of these
investigations I have analyzed bank statements and other
financial records, conducted surveillance, participated in the
execution of search and arrest warrants, and seized evidence of
violations of federal law.

     8.    The information contained in this Complaint is based
upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources, including, but not limited to: (a) business records and
other documents, including bank records and records of
electronic communications; (b) publicly available documents; (c)
conversations with, and reports of interviews with, non-law-
enforcement witnesses; (d) conversations with, and reports
prepared by, other HSI and law enforcement agents.  Because this
Complaint is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.
Where the contents of documents and the actions and statements
of and conversations with others are reported herein, they are
reported in substance and in part.  Where figures, calculations,
and dates are set forth herein, they are approximate, unless
stated otherwise.

## OVERVIEW OF THE VAT REFUND SCHEME

     9.    Based on my conversations with law enforcement
counterparts and authorities in Mexico, I understand that the
Mexican government imposes a sales tax on goods sold from one
Mexican company to another, which is known as the "IVA" or Value
Added Tax ("VAT").  However, when certain goods (such as
cellular phones) are exported from Mexico, the previously-paid
VAT is refunded to the exporter.  The amount of the VAT to be
paid, as well as the VAT reimbursement for exported goods, is
based, in large part, on the value of the goods purchased or
exported, with the higher the value, the greater the VAT due,
and, in the case of goods being exported, the higher the VAT
reimbursement that the exporter can seek.  I also understand
that Mexican tax and law enforcement authorities have identified
a commonly-used fraudulent scheme in which individuals and
entities in Mexico attempt to procure VAT reimbursements to
which they are not entitled by procuring and submitting to the
Mexican tax authority fraudulent invoices and export documents

that falsely inflate the sales price or value of the exported goods at issue.

10.   As set forth below, CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, own and control dozens of companies (the "Front Companies") purportedly doing business as importers and exporters of cellular phones in order to fraudulently obtain VAT refunds from the Mexican government.

11.   In order to carry out the scheme, CARLOS DJEMAL and ISIDORO HAIAT, the defendants, caused Front Companies in Mexico to purchase outdated cellular phones from other companies seeking to sell off outdated inventory.  DJEMAL and HAIAT then caused these phones to be exported to Front Companies in the United States owned and operated by others involved in the scheme.  During the export process, DJEMAL and HAIAT obtained fraudulent invoices and created export documents that each falsely inflated the value of the phones being exported, thereby enabling them to fraudulently seek falsely inflated VAT refunds from the Mexican tax authority.

12.    Once the phones were shipped to the United States, they were transferred to one or more Front Companies in the United States created by BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, or DANIEL BLITZER, the defendants, and then shipped back to a different Front Company in Mexico.  Through this process, the phones were shipped repeatedly in a circular fashion between Front Companies controlled by the defendants and their co-conspirators in Mexico and the United States, enabling CARLOS DJEMAL and ISIDORO HAIAT, the defendants, to seek and obtain multiple fraudulent VAT refunds for the same phones.

13.   In regard to the transfer of funds between accounts held by the Front Companies as part of the scheme, each transfer of phones was generally accompanied by a transfer of funds to and from accounts held in the name of the relevant Front Companies and beneficially owned and controlled by the defendants or their co-conspirators.  Each recipient Front Company of the cell phones wired money to the relevant sending Front Company in order to create the appearance of a legitimate sale.  As part of the scheme, each defendant or co-conspirator who controlled a Front Company receiving funds as part of the scheme retained approximately 1% for their participation in the scheme.  In many instances, funds were transferred from accounts

in Mexico, to accounts in the United States, and then to accounts back in Mexico, all within a week.

14.    From approximately June 2011 to approximately May 2016, CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, moved more than $100 million dollars through dozens of accounts maintained by Front Companies in this fashion, including through accounts maintained at a financial institution in the Southern District of New York.

### DEFENDANTS' PARTICIPATION IN THE VAT REFUND SCHEME

15.    Based on my interviews with a cooperating witness ("CW-1"),[1] I have learned the following:

a.    In or about 2011, CW-1 was introduced to the scheme by a second cooperating witness ("CW-2") and was advised that if CW-1 was interested he could join the scheme and that in order to participate in the scheme, CW-1 needed to create a few companies in the United States and open bank accounts for those companies.

b.    In or about January 2012, CW-1 met with CARLOS DJEMAL and ISIDORO HAIAT, the defendants, at the office of Mobile Evolution, S.A. de C.V. ("Mobile Evolution"), a company located in Mexico City, Mexico that is beneficially owned and controlled by DJEMAL and HAIAT and that maintains an office and handles the administrative details of the scheme.

c.    At this initial meeting, HAIAT and DJEMAL explained, in sum and substance, that they were engaged in a fraudulent VAT refund scheme and needed individuals in the United States whom they could trust to open purported cell phone companies and bank accounts affiliated with those companies. HAIAT and DJEMAL instructed CW-1 to open 3-4 companies and advised that he could earn a 1% commission for each transfer, to be shared with certain other participants in the scheme.    HAIAT

---

[1] CW-1 has pled guilty to a federal charge related to the scheme and has already been sentenced.    Information provided by CW-1 has proven to be reliable in that information provided by CW-1 has been corroborated by, among other things, seizures, bank records, receipts, physical surveillance, emails, and other witness interviews.

and DJEMAL further stated, in sum and substance, that they used "paper owners" to create companies in Mexico that exported and imported cell phones. HAIAT and DJEMAL added that they were planning a meeting in a few weeks with other participants in the scheme and suggested that CW-1 attend.

d.     Soon thereafter, CW-1 incorporated several companies in the United States, opened bank accounts for each, and began importing phones from Mexico, sending funds to accounts in Mexico to correspond with the shipments of phones, and shipping the phones he received to another co-conspirator in the United States, who then sent the phones back to a Front Company in Mexico.

e.     During 2012, CW-1 attended multiple meetings in furtherance of the scheme in Mexico City organized by DJEMAL and HAIAT. These meetings were also attended by BRAULIO LOPEZ, DANIEL BLITZER, and MAX FRAENKEL, the defendants, and other co-conspirators not named as defendants herein.

f.     DJEMAL and HAIAT paid for CW-1 and others to travel to Mexico.

g.     Each meeting was held at the Mobile Evolution office.

h.     At the meetings, DJEMAL and HAIAT reiterated, in sum and substance, that the exports to the United States were for the purpose of fraudulently obtaining VAT refunds from the Mexican government. DJEMAL and HAIAT also explained, in sum and substance, that they hoped for at least $1 million per month to be transferred through each company created in the United States and that they had been carrying out this scheme for a long time with no problems in the United States.

i.     DJEMAL and HAIAT also stated, in sum and substance, that they were the owners of a currency exchange, Casa de Cambio Tiber, S.A., de C.V. ("Tiber"), but that they were also obtaining a banking license and had plans to purchase a bank.

j.     Between in or about June 2012 and in or about June 2013, CW-1 received and transferred approximately $18 million through his companies and earned approximately a 1% commission, which he split with two other co-conspirators.

16.  Based on my interviews with CW-2,[2] I have learned the following:

a.  In or about February 2011, CW-2 was introduced to the scheme by CARLOS DJEMAL, the defendant, while attending a wedding in Mexico City.

b.  While in Mexico City, CW-2 was invited to DJEMAL's business office, where DJEMAL explained to CW-2 that he has a business opportunity for him in the United States. DJEMAL explained, in sum and substance, that he was involved in a scheme to obtain fraudulent VAT refunds from the Mexican government by exporting cell phones to the United States with fraudulently inflated invoices.  DJEMAL instructed CW-2 that he could earn money by creating two companies in the United States, one to import cell phones from Mexico and another to export cell phones back to Mexico.  DJEMAL also instructed CW-2 to open bank accounts for each of the companies.  DJEMAL explained to CW-2, in sum and substance, that the same phones moved in a circle from two companies in Mexico to two companies in the United States and that the money moved in the opposite direction.

c.  Soon thereafter, in or about March 2011, CW-2 created several Front Companies in the United States, opened bank accounts for each of those companies, and began importing phones from Mexico to a company he created, shipping them to a second company in the United States that he created, and then shipping the phones back to a Front Company in Mexico.

d.  CW-2 also wired money from the Front Company accounts he opened and controlled to accounts in Mexico, retaining approximately 1% of the funds transferred into his accounts as part of the scheme as a commission for his participation in the scheme.

e.  In or about June 2011, the United States Customs and Border Patrol ("CBP") seized several shipments from Mexico

---

[2] CW-2 has pled guilty to federal charges related to the scheme and has already been sentenced.  Information provided by CW-2 has proven to be reliable in that information provided by CW-2 has been corroborated by, among other things, seizures, bank records, receipts, physical surveillance, emails, and other witness interviews.

to CW-2's Front Company in the United States and determined that
the cell phones were non-functioning and missing internal
working parts.  Thereafter, CW-2 suggested to DJEMAL that, going
forward, the phones should contain working parts so as not to
create a "red flag."    CW-2 also requested that the phones be
sent to his company from another co-conspirator in the United
States, rather than directly from Mexico.    Thereafter, CW-2
typically received shipments of phones from a Front Company in
the United States controlled by CW-1 rather than directly from
Mexico.

       f.    During 2012, CW-2 attended multiple meetings in
Mexico City requested and paid for by DJEMAL.    DJEMAL and HAIAT
ran the meetings largely in Spanish, which CW-2 does not speak.
Through the course of these meetings, however, CW-2 met MAX
FRAENKEL, DANIEL BLITZER, and BRAULIO LOPEZ, the defendants, and
learned that they were also participating in the scheme.

    17.    Based on my interviews with a third cooperating
witness ("CW-3"),[3] I have learned the following:

       a.    In or about 2011, ISIDORO HAIAT, the defendant,
introduced CW-3 to the cell phone scheme.    CW-3 had known HAIAT
for several years, as HAIAT regularly visited an upscale store
in Miami, Florida, where CW-3 then worked.    HAIAT invited CW-3
to come to Mexico City to learn more about a business
opportunity involving importing cell phones.    HAIAT purchased a
plane ticket for CW-3 and had a chauffeur bring CW-3 to the
meeting.

       b.    At the meeting, CW-3 met CARLOS DJEMAL, the
defendant.    DJEMAL and HAIAT ran the meeting, during which CW-3
was instructed to open up a purported cell phone company in
Miami, and was assured that there would be no start-up costs for
him.    Soon thereafter, CW-3 created a Front Company in Miami,
opened a bank account for the company, and began importing
phones from Mexico, relabeling the shipments, and sending them
back to Mexico in accordance with instructions he received from

---

[3] CW-3 has pled guilty to a federal charge related to the
scheme and has already been sentenced.    Information provided by
CW-3 has proven to be reliable in that information provided by
CW-3 has been corroborated by, among other things, seizures,
bank records, receipts, physical surveillance, emails, and other
witness interviews.

an assistant to DJEMAL and HAIAT in Mexico. He received and sent
funds by wire to and from Mexico corresponding to the cell phone
shipments and retained approximately 1% of the amount of funds
wired.

         c.   In or about 2012, CBP seized a shipment of cell
phones from Mexico addressed to CW-3's Front Company in the
United States.  When CW-3 learned of the seizure, he called
HAIAT, who informed CW-3, in sum and substance, that he would
handle the situation.  CW-3 was arrested shortly after the
seizure.

    18.   Based on a review of state incorporation records and
websites for the Front Companies created in the United States by
BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, and DANIEL BLITZER,
the defendants, and based upon my training and experience
investigating money laundering, I have learned the following:

         a.   Beginning in or about September 2011, LOPEZ
created and controlled several companies purportedly in the
business of cell phone imports and exports, including Alpha
Wireless Toys, LLC, K1 Tech LLC, Lofer Holdings, LLC, Beacon
Communications, LLC, Cellular Wholesalers of Texas, LLC, Direct
Mobile Technologies, LLC, First Cell Gadgets, LLC, Gerry's
Cellulars, LLC, Edge Cellulars, LLC, High Mobile Tech, LLC, and
Litespeed Wireless LLC.

         b.   Beginning in or about September 2011, BLITZER
created and controlled several companies purportedly in the
business of cell phone imports and exports, including Unicorp
International LLC, Santronic Mobile Communications Inc., Optin
Worldwide LLC, and Sevenco Trading LLC.

         c.   Beginning in or about May 2011, FRAENKEL created
and controlled several companies purportedly in the business of
cell phone imports and exports, including Mafra Trading Co. Inc.
and Celexport Co. Inc.

         d.   Beginning in or about July 2012, MORENO created
and controlled several companies purportedly in the business of
cell phone imports and exports, including Jackson Phone Store
LLC, International Wireless Wholesalers LLC, Barmo LLC, Ingas
Holdings LLC, Nate's Wireless Toys, Metro Cellular LLC, Orbit
High Tech LLC, P1 Communications LLC, and Alepa LLC.

         e.   The address provided for each Front Company

listed above in subparagraphs (a) through (d) was either at the residence of the defendant who created the company or a "virtual office," where a fee is paid to receive mail, messages, and packages at the business location.

       f.   None of the companies listed above in subparagraphs (a) through (d) had a website through which phones could be purchased or that contained any other substantive content.

    19.  Based on my review of travel records, I know that:

       a.   From in or about January 21, 2012, until in or about January 26, 2012, DANIEL BLITZER, and MAX FRAENKEL, the defendants, as well as CW-1 and other co-conspirators not named herein, traveled to Mexico.

       b.   From in or about June 3, 2012, until in or about June 6, 2012, BRAULIO LOPEZ, BLITZER, and FRAENKEL, the defendants, as well as CW-2 and other co-conspirators not named herein, traveled to Mexico.

       c.   From in or about December 2, 2012, until in or about December 5, 2012, LOPEZ, BLITZER, and FRAENKEL, CW-1, CW-2, and other co-conspirators not named herein, traveled to Mexico.

    20.  Based on a review of bank records, I know that in or about February 2014, CARLOS DJEMAL and ISIDORO HAIAT, the defendants, purchased Investa Bank, S.A. ("Investa Bank"), a Mexican financial institution.

    21.  Based on a review of state corporate formation records and bank records, and based upon my training and experience investigating money laundering, I have learned the following:

       a.   BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, established bank accounts for each of the Front Companies identified in Paragraph 18 (the "Accounts").

       b.   The activity in each of the Accounts indicated credit and debit activity relating only to the maintenance of virtual offices and the movement of phones, such as incorporation fees, wire fees, shipping fees, payments for virtual office space, and reimbursements for such fees.

c.   The Front Companies in Mexico that received funds
from the Front Companies in the United States included Reliance
Mobile S.A. de C.V. ("Reliance Mobile"), Mobile Evolution,
Skinet Mobile, Accent Mobile S.A. de C.V. ("Accent Mobile"), and
Hudson Telecomunicaciones ("Hudson").  Each of these entities
received these funds through accounts maintained at Tiber or
Investa Bank.

d.   Each Front Company in the United States typically
received funds from Mexico from accounts at Tiber or, later,
from accounts at Investa Bank and transferred funds back to
Tiber or Investa Bank.  Typically, funds were received from
accounts in Mexico, and transferred back to accounts in Mexico,
within approximately one week.

e.   Between in or about October 2011 and in or about
May 2015, LOPEZ moved approximately $65 million between his
Accounts in the United States and accounts in Mexico.  The flow
of funds through LOPEZ's Accounts indicates that LOPEZ retained
approximately 1% of this amount.

f.   Between in or about October 2011 and in or about
June 2013, BLITZER moved approximately $59 million between his
Accounts in the United States and Mexico.  The flow of funds
through BLITZER's Accounts indicates that BLITZER retained
approximately 1% of this amount.

g.   Between in or about May 2011 and April 2013,
FRAENKEL moved approximately $36 million between his Accounts in
the United States and Mexico. The flow of funds through
FRAENKEL's accounts indicates that FRAENKEL retained
approximately 1% of this amount.

h.   Between in or about July 2012 and in or about May
2016, MORENO moved approximately $12 million between his
Accounts in the United States and Mexico.  The flow of funds
through MORENO's accounts indicates that MORENO retained
approximately 1.5% of this amount.

22.  Based on a review of VAT refund documents obtained
from the Servicio de Administracion Tributaria (the "SAT"), the
Mexican tax authority, and conversations with law enforcement
agents from both the United States Internal Revenue Service and
the in Mexico City, I have learned, among other things, that,
since in or about March 2010 through in or about September 2015,
the Mexican companies identified in Paragraph 20 (Reliance

Mobile, Skinet Mobile, Accent Mobile, Hudson, and Mobile Evolution) have each received VAT refunds.  The combined VAT refund amounts paid to these companies totaled at least approximately 400,000,000 Mexican pesos, or approximately 21,000,000 U.S. dollars.

23.  Based on a review of emails obtained pursuant to a search warrant from an account maintained by BRAULIO LOPEZ, the defendant, I have learned, among other things, the following:

a.   In or about October 4, 2011, LOPEZ sent an email to CARLOS DJEMAL, the defendant, informing him of the cost for incorporating Lofer Holdings, Alpha Wireless, Beacon Communications, Cellular Wholesalers, and Direct Mobile, and confirming that he set up websites for each of the companies.

b.   On or about October 5, 2011, LOPEZ sent an email to ISIDORO HAIAT, the defendant, attaching bank account and corporate information for Lofer Holdings, Alpha Wireless, Beacon, Cellular Wholesalers, and Direct Mobile.  LOPEZ also attached a chart with a diagram showing "Products Flow" from "Mex I" to "Alpha" to "Beacon" and back to "Mex II."  The chart also contained a diagram labeled "Payments Flow" from "Mex II" to "Beacon" to "Alpha" and back to "Mex I."  The Mexican companies identified on the chart as the final recipients of funds included, among others, Mobile Evolution and Reliance Mobile.

c.   On or about October 21, 2011, LOPEZ received an email from an assistant at Mobile Evolution, attaching a "presentation with the details about Mobile Evolution and the companies involved with the process." The attached presentation describes, in sum and substance, how cell phone packages should be shipped and invoiced, and how wire transfers and payment notices should be communicated among Alpha Wireless, Beacon Communications, and Mobile Evolution. The wire transfer process suggests that the cycle be completed within in a week and refers to "1% for commission."

d.   In or about June 2012, LOPEZ began corresponding with ROBERTO MORENO, the defendant, about setting up new companies.

e.   In or about July 2012, LOPEZ emailed an administrative assistant at Mobile Evolution providing, in sum

13

and substance, corporate and bank account information concerning Jackson Phone Store LLC, a Front Company created by MORENO.

      f.   In or about December 2012, MORENO communicated with an assistant at Mobile Evolution concerning payment of an import bill and with another Mexican company, advising that they "have to maintain the money in the accounts for a minimum of 2 days."

    24.  Based on a review of shipping records and records maintained by CBP, and based on conversations with CBP agents, I have learned, among other things, the following:

      a.   Beginning in or about 2011, the Front Companies established by BRAULIO LOPEZ, ROBERTO MORENO, DANIEL BLITZER, and MAX FRAENKEL, the defendants, have received multiple cell phone shipments from Mexico.

      b.   The Mexican companies exporting the phones to these Front Companes included, among others, Skinet Mobile, Mobile Evolution, Reliance Mobile, and Accent Mobile.

      c.   Between in or about July 2011 and February 2012, CBP seized approximately four shipments of cell phones imported from Accent Mobile to Santronic Mobile Communication, one of FRAENKEL's Front Companies in the United States.  CBP determined that the cell phones contained no internal electronics and did not function. In contrast, the corresponding import documents valued the phones at several hundred dollars each.

      d.   In or about May 2016, CBP inspected one shipment of cell phones from Reliance Mobile to Orbit High Tech, one of MORENO's Front Companies. That shipment contained outdated or used cell phones. In contrast, the corresponding import documents valued the phones at several hundred dollars each.

WHEREFORE, deponent prays that arrest warrants be issued for CARLOS DJEMAL, ISIDORO HAIAT, BRAULIO LOPEZ, ROBERTO MORENO, MAX FRAENKEL, and DANIEL BLITZER, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

PETER CHARTIER
Special Agent
Department of Homeland
Security Investigations

Sworn to before me this
25th day of October, 2016.

THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

15